IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANGELA VNUK, :
 :
       Plaintiff, :
 :
v. : 3:14-CV-01432
 : (JUDGE MARIANI)
BERWICK HOSPITAL CO. and :
MALIYAKKAL J. JOHN, :
 :
       Defendants. :

## MEMORANDUM OPINION

### I.    Introduction

Two Partial Motions to Dismiss Plaintiff's Amended Complaint are presently before the Court. The first is a Motion filed by Defendant Maliyakkal John to Dismiss Counts Four and Five for lack of subject matter jurisdiction and to Dismiss Count Ten for failure to state a claim. (*See* Doc. 8.) The second is a Motion filed by Defendant Berwick Hospital to Dismiss Count Eight for failure to state a claim. (*See* Doc. 11.) For the reasons that follow, the Court will deny Defendant John's Motion and grant Defendant Berwick Hospital's Motion.

### II.    Factual Allegations and Procedural History

Plaintiff first filed a Complaint in this action on July 24, 2014. (*See* Compl., Doc. 1.) The Defendants filed their Motions to Dismiss shortly thereafter. (*See* Docs. 8, 11.) After these Motions were fully briefed, Plaintiff filed an Amended Complaint on December 8, 2014. (See Am. Compl., Doc. 23.) Rather than allow the filing of the Amended Complaint *to*

render their fully-briefed Motions moot, the parties notified the Court that they would like their Motions to be deemed to apply to the Amended Complaint. (*See* Kate Kleba Letter, Dec. 23, 2014, Doc. 26, at 1.) The Court agrees that this is an appropriate procedure to secure the just and speedy determination of this action, and will accordingly treat all pending Motions to Dismiss and corresponding briefs as though they were originally directed at the Amended Complaint.

The Amended Complaint alleges the following well-pleaded facts.

Plaintiff Angela Vnuk is a registered nurse who began working in Defendant Berwick Hospital's emergency room in October 2010. (Am. Compl., Doc. 23, at ¶¶ 8-9.) Beginning in November 2010 and continuing through June 2013, Defendant Maliyakkal John, a medical doctor and chief of staff of the hospital, subjected Ms. Vnuk to the following forms of sexual harassment:

> A. Telling an ER employee that "when Angela gets out of the bathroom tell her to come to my room." The "room" referred to a room where physicians sleep at night.
> B. On a regular basis grabbing or slapping Ms. Vnuk's behind.
> C. Telling Ms. Vnuk that she has an "apple ass" and that he wants to take a bite.
> D. Looking directly at Ms. Vnuk and running his tongue suggestively over his lips, while moaning at Ms. Vnuk.
> E. Pulling Ms. Vnuk onto his lap.
> F. Caressing Ms. Vnuk's arm.
> G. Commenting repeatedly how he "loves [Ms. Vnuk's] ass."
> H. In front of Ms. Vnuk, stating to another male, "Wouldn't you love to see Angela naked?"
> I. When Ms. Vnuk was handing Dr. John a chart, grabbing her arm and kissing it.
> J. Brushing the back of his fingers against Ms. Vnuk's breast.

2

    K. Coming up behind Ms. Vnuk, putting his head on her shoulder and trying to put his tongue in Ms. Vnuk's ear.
    L. While Ms. Vnuk was working on a patient who had come into the ER suffering from a massive heart attack and was at risk of death, leering at Ms. Vnuk and rolling his tongue over his lips at Ms. Vnuk.
    M. Showing sexually explicit videos to staff.
    N. Following Ms. Vnuk around the ER and demanding a hug.
    O. On multiple occasions when Ms. Vnuk would tell Dr. John to stop touching her, he would respond "You are like a drug; I cannot stop touching you."
    P. Several times Dr. John whispered in Ms. Vnuk's ear "I wish I was your husband for just one day."
    Q. Dr. John asked Ms. Vnuk on multiple occasions "what is your husband's favorite position in bed with you?," and would laugh when Ms. Vnuk walked away.
    R. Dr. John frequently called Ms. Vnuk "Pumpkin," and would lick his lips sexually and moan when he called her that name.

(*Id.* at ¶¶ 7, 10-11.) "The Hospital's official sexual harassment policy prohibits all of the behavior identified above." (*Id.* at ¶ 18.)

Vnuk repeatedly told John to stop this conduct and complained to several supervisors about him. (*Id.* at ¶¶ 12-13.) John's actions were also common knowledge among hospital employees. (*Id.* at ¶ 13.) Nonetheless, when by June 2013 the actions had not stopped, "Ms. Vnuk told other Hospital employees that she could not take the sexual harassment anymore" and intended to file a formal complaint with the hospital. (*Id.* at ¶ 14.) She reported John's conduct to the Hospital's Director of Human Resources and submitted a Harassment Complaint form to the Hospital's human resources department. (*Id.* at ¶¶ 16-17.)

    This complaint did not have the intended effect. Rather,

3

> [u]pon information and belief, the Hospital did not initiate a "full and effective investigation of Ms. Vnuk's sexual harassment complaint [as required by internal Hospital policy, (see id. at ¶ 19)]. Instead, the Hospital opted not to interview staff to determine the facts about Dr. John's sexually harassing behavior toward Ms. Vnuk.

(Id. at ¶ 20.) But not only did the Hospital not investigate; according to Vnuk, the Hospital and John proceeded to retaliate against her in various ways.

First, after Vnuk made her initial complaint, John

> falsely stated to the Hospital and to others who worked at the Hospital that Ms. Vnuk had used his DEA number to call in prescriptions without Dr. John's permission. Upon information and belief, such acts, if true, would constitute crimes and reason for discipline with respect to Ms. Vnuk's nursing license.

(Id. at ¶ 26.) Vnuk does not deny that she used John's DEA number to call in prescriptions for herself in the past, but alleges that she only did so with his permission and authorization. (See id. at ¶¶ 21-22.) She also alleges that "[i]n accordance with his professional responsibility, Dr. John made sure there was a chart for Ms. Vnuk in his private office, outside the hospital." (See id. at ¶ 23.) The Court interprets this allegation, which is stated in the context of Dr. John authorizing Vnuk to call in prescriptions for herself, to imply that some sort physician-patient relationship existed between John and Vnuk.

Second, the Hospital suspended Vnuk, but revoked the suspension a mere five hours later. (Id. at ¶ 27.) It is unclear from the Amended Complaint what the justification for either the suspension or the revocation actually was.

Third, the Hospital attempted to solve the sexual harassment problem by only scheduling Vnuk and John to work different shifts. This caused a reduction in work hours for

4

Vnuk, the alleged victim, but none for John, the alleged perpetrator, who has suffered no adverse consequences for his conduct. (*Id.* ¶¶ 28-29.)

Fourth, after Vnuk filed her original Complaint in federal court, John resurrected his false claims that Vnuk had used his DEA number to call in prescriptions for herself. (*See id.* at ¶ 30.) On September 23, 2014, he reported this claim to the Berwick Police Department. (*Id.* at ¶ 31.) Then, on October 6, 2014, he made the same report to the Pennsylvania Department of State's Bureau of Enforcement and Investigation. (*Id.* at ¶ 33.)

Finally, Vnuk states that the Hospital engaged in other retaliatory conduct in the late summer of 2014 by disciplining her unnecessarily and constructively discharging her when it did not schedule her to work any hours from July 27, 2014 through September 6, 2014. (*See id.* at p. 7, n. 1.) However, she also states that she filed "a new administrative complaint" alleging these issues "with the Pennsylvania Human Relations Commission and U.S. Equal Opportunity Commission" and is currently awaiting a Notice of Right to Sue on that complaint. (*Id.*) She intends "file a supplemental complaint" in our instant case when she receives such Notice. (*Id.*) The Court will therefore not address these facts in this Opinion, but will address them, if need be, once Plaintiff actually amends her Complaint. Of course, any further amended complaint will be subject to the ruling made in this Opinion.

The present Amended Complaint alleges twelve counts, covering a variety of matters, against Berwick Hospital and Maliyakkal John. The Motions to Dismiss only address some of those counts, which the Court treats below.

5

## III. Analysis

The parties' briefs attack certain counts for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) and attack others for failure to state a claim under Rule 12(b)(6). 12(b)(1) motions are subject to different standards from 12(b)(6) motions. Therefore, the discussion that follows addresses the two types of motions separately.

### a. Lack of Subject Matter Jurisdiction

#### i. Standard of Review

"Before filing a PHRA [Pennsylvania Human Rights Act] claim in court, an employee must file a complaint with the PHRC [Pennsylvania Human Rights Commission]." *Huggins v. Coatesville Area Sch. Dist.*, 452 Fed. App'x 122, 127 (3d Cir. 2011) (citing *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001)). This filing requirement must be satisfied before an employee is allowed to file a PHRA claim in court; if it is not, the claim will be considered unexhausted. See *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 919-20 (Pa. 1989). Such "failure to exhaust . . . administrative remedies render[s] the district court without jurisdiction to entertain the suit." *First Jersey Sec., Inc. v. Bergen*, 605 F.2d 690, 700 (3d Cir. 1979). Therefore, failure of PHRA exhaustion is appropriately raised by a motion to dismiss for lack of subject matter jurisdiction. *See, e.g., Rosetsky v. Nat'l Bd. of Med. Examiners of U.S., Inc.*, 350 Fed. App'x 698, 703 (3d Cir. 2009). Federal Rule of Civil Procedure 12(b)(1) provides the vehicle to do this.

6

There are two types of Rule 12(b)(1) motions: "12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "[A]t issue in a factual 12(b)(1) motion is the trial court's jurisdiction[,] its very power to hear the case." *Id.* Thus, in evaluating such factual challenges,

> there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Id.*

This case presents a factual attack on jurisdiction that has nothing to do with the pleadings, but only with the question of whether Plaintiff Vnuk adequately exhausted her administrative remedies when she filed her administrative complaint with the PHRC. Therefore, the Court need not confine itself to the information in the Amended Complaint and may examine the relevant administrative documents.

### ii. PHRA Claims (Counts Four and Five)

John argues that Plaintiff has not fully exhausted her administrative remedies because the only respondent named in the caption of her PHRC complaint was Berwick Hospital, not John himself. This, he argues, precludes her from proceeding in federal court against him on her PHRA claims (Counts Four and Five). (*See* Def. John's Br. in Supp. of

7

Mot. to Dismiss, Doc. 12, at 8.) The Plaintiff agrees that she did not name John in the PHRC complaint. (*See* Pl.'s Br. in Opp. to Def. John's Mot. to Dismiss, Doc. 15, at 2.) She also agrees that the PHRC complaint that John submitted to the record—which reflects a failure to name him in the caption—is true and authentic. (*See id.* at 2 n. 1.) So the jurisdictional issue turns entirely on the legal question of whether the PHRC complaint submitted as CM/ECF Document 8-3 adequately exhausted Plaintiff's administrative remedies against Maliyakkal John.

As Plaintiff notes, (*see id.* at 4), John is mentioned by name and by implication throughout the PHRC complaint, (*see* Doc. 8-3 at ¶¶ 7-11, 13-23, 25, 28-32, 35, 38). The vast majority of allegations in the PHRC Complaint reference him directly, while nearly every single one implicates him indirectly, e.g., by claiming that the Hospital failed to take action on Vnuk's complaints about him or that it retaliated because of those complaints.

The protections of the federal antidiscrimination statute (Title VII of the 1964 Civil Rights Act) and the PHRA are treated as identical and interchangeable.[1] *See Weston v. Pennsylvania*, 251 F.3d 420, 425 n. 3 (3d Cir. 2001), *overruled in part on other grounds*, *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). Both statutes' "purpose of requiring an aggrieved party to resort first to [administrative remedies] is twofold: to give notice to the charged party and provide an avenue for voluntary compliance without resort to litigation." *Glus v. G.C. Murphy Co.*, 562

---

[1] Accordingly, even though John attacks the only sufficiency of Plaintiff's PHRA claims, the Court also applies Title VII case law in this Opinion.

F.2d 880, 888 (3d Cir. 1977). Moreover, the PHRA provides that it "shall be construed liberally for the accomplishment of the purposes thereof, and any law inconsistent with any provisions [t]hereof shall not apply." 43 Pa. Cons. Stat. Ann. § 962(a).

A Title VII or PHRA action "ordinarily may be brought only against a party previously named in an [administrative] action." *Schafer v. Bd. of Pub. Educ. of Sch. Dist. of Pittsburgh*, 903 F.2d 243, 251-52 (3d Cir. 1990) (citing *Glus*, 629 F.2d at 251). But consistent with the above principles, courts do not narrowly interpret this "naming" requirement to apply only to the caption of the administrative charge. Naming a person in the body of the charge is considered sufficient to satisfy the requirement:

> [C]ourts relax Title VII's jurisdictional requirements—and necessarily the PHRA's as well—where a plaintiff has named the subsequent defendants in the body of the administrative charge. *Kinally* [*v. Bell of Pennsylvania*], 748 F. Supp. [1136,] 1140 [(E.D. Pa. 1990)] (permitting suit against parties named in administrative charge); *see Dreisbach* [*v. Cummins Diesel Engines, Inc.*], 848 F. Supp. [593,] 596-97 [(E.D. Pa. 1994)] (distinguishing *Kinally* where individual defendants were not named in charge). Naming the defendants in the charge ensures that they will know of and participate in the PHRC proceedings, and gives them an opportunity to resolve matters informally, without further litigation.

*Glickstein v. Neshaminy Sch. Dist.*, Civ. No. 96-6236, 1997 WL 660636, at *10 (E.D. Pa. Oct. 22, 1997); *see also Hills v. Borough of Colwyn*, 978 F. Supp. 2d 469, 478 (E.D. Pa. 2013) ("'Courts have found that the individuals do not have to be named in the caption of the case and that just mentioning the individuals in the body of the Complaint gives the individuals the requisite notice so that judicial relief may be sought under the PHRA.'") (quoting *DuPont v. Slippery Rock Univ. of Pennsylvania*, Civ. No. 11-1435, 2012 WL 94548,

9

at *3 (W.D. Pa. Jan. 11, 2012)); *McInerney v. Moyer Lumber & Hardware, Inc.*, 244 F. Supp. 2d 393, 398-99 (E.D. Pa. 2002) ("A plaintiff's claims are preserved as long as she names the defendants in the body of the EEOC administrative complaint because it provides the defendants with the requisite notice that their conduct is under formal review. It is not necessary that the defendants be named in the caption as a respondent."); *Kunwar v. Simco*, 135 F. Supp. 2d 649, 654 (E.D. Pa. 2001) ("In this case, Defendants contend that because Plaintiff named only 'Simco' in the caption of her administrative charge, she has failed to exhaust her administrative remedies with respect to the individual Defendants. In making this argument, Defendants overlook the text in the body of Plaintiff's charge. . . . Given that each of the above named Defendants were specifically referred to in one or both of Plaintiff's EEOC charges, we find that they were sufficiently put on notice and that Plaintiff has exhausted her administrative remedies with respect to them."); *Jankowski v. Fanelli Bros. Trucking Co.*, Civ. No. 13-2593, 2014 WL 690861, at *4-8 (M.D. Pa. Feb. 24, 2014) (summarizing case law and finding that claims against defendants not "named in either the caption or the body of the Charge of Discrimination" were unexhausted under the facts of the case).

The clear weight of case law compels the conclusion that the claims against John were administratively exhausted. Nearly the entire body of the PHRC charge concerns Dr. John's conduct and a large number of allegations address him directly by name. Under the cases cited *supra* this put him on notice that his case was under review and therefore

satisfied the purposes of the PHRA and its naming requirement. Accordingly, John's Rule 12(b)(1) Motion is denied.[2]

### b. Failure to State a Claim

#### i. Standard of Review

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-1965 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555, 127 S. Ct. at 1965. A court

---

[2] Because the Court finds that John was adequately "named" in the body of the administrative complaint, it is unnecessary to determine whether this case falls into the exception, discussed in the parties' briefs, that allows a judicial action against an unnamed party "when the unnamed party received notice [of the administrative complaint] and when there is a shared commonality of interest with the named party." *Schafer*, 903 F.2d at 252. This exception only applies when the party was not named at all, either in the caption or the body of the administrative complaint. *See, e.g., Jankowski*, 2014 WL 690861, at *8 (only considering the *Schafer* exception once it was determined that the defendants were not named in the administrative complaint).

"take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231, n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

However, even if a "complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that

amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

### ii. Breach of Fiduciary Duty (Count Ten)

Defendant John next moves to dismiss Plaintiff's Count Ten (styled "Breach of Fiduciary Duty") for failure to state a claim. (*See* Doc. 12 at 8.)

Pennsylvania recognizes a cause of action for breach of physician-patient confidentiality. *See Haddad v. Gopal*, 787 A.2d 975, 980 (Pa. Super. Ct. 2001); *Moses v. McWilliams*, 549 A.2d 950, 953-54 (Pa. Super. Ct. 1988). In the absence of a specific exception, "[d]octors have an obligation to their patients to keep communications, diagnosis, and treatment completely confidential." *Haddad*, 787 A.2d at 981. "The harm arising from a breach entails not only the mental suffering due to exposure of private information, but also subsumes an erosion of an essential, confidential relationship between the health care services provider and the patient." *Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374, 380 (Pa. 2009). Therefore, when a disclosure of a patient's information is made "without legal justification or excuse," that disclosure may "be actionable at law." *Moses*, 549 A.2d at 954.

Here, Plaintiff's Amended Complaint alleges that John, a medical doctor, gave Vnuk permission and authorization to call in prescriptions for herself using his DEA number. (*See* Am. Compl. at ¶¶ 21-22.) It also alleges that John maintained patient

13

records for Vnuk, ostensibly because he had some physician relationship with her. (*See id.* at ¶ 23.) Then, the Amended Complaint alleges that John falsely reported to the Hospital, the Berwick Police Department, and the Pennsylvania Department of State that Vnuk called in these prescriptions without authorization, solely as retaliation for her reports of harassment. (*Id.* at ¶¶ 26, 30-37.)

Disclosing confidential a patient's pharmaceutical needs for personal retaliation is certainly the kind of disclosure "without legal justification or excuse" that could subject John to a breach of confidentiality claim under Pennsylvania law. Indeed, it is difficult to imagine a disclosure with less legal justification than that. Thus, when the Court accepts the allegations in the Complaint as true—as it must under Rule 12(b)(6)—it concludes that Plaintiff has alleged sufficient facts to state a breach of confidentiality claim. The Court recognizes that the facts alleged are relatively sparse[3] and may be subject to attack at later stages of litigation. But at this stage, it finds that Plaintiff has alleged just enough facts to avoid dismissal of Count Ten. Accordingly, John's 12(b)(6) Motion is denied.

---

[3] For instance, they do not state the specific contents of John's false reports to the authorities. If he only reported that Vnuk committed a crime, but did so without divulging any personal information, then this may be insufficient to establish a breach of physician-patient confidentiality claim, even if the report was false or maliciously motivated.

### iii. *Intentional Infliction of Emotional Distress (Count Eight)*

Finally, Defendant Berwick Hospital filed a 12(b)(6) Motion, which attacks only Count Eight of the Amended Complaint, which alleges Intentional Infliction of Emotional Distress ("IIED"). (*See* Def. Berwick Hosp.'s Mot. to Dismiss, Doc. 11, at ¶¶ 11-15.)

In order to prevail on an IIED claim, the plaintiff must show conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)). The Pennsylvania Superior Court has repeatedly held that, "[g]enerally [a cognizable IIED] case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'" *See, e.g., Small v. Juniata Coll.*, 682 A.2d 350, 355 (Pa. Super. Ct. 1996).

"[I]t must be recognized that it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988). Nonetheless, "courts applying Pennsylvania law have found conduct outrageous in the employment context . . . where an employer engaged in both sexual harassment and other retaliatory behavior against an employee." *Id.* (citing *Bowersox v. P.H. Glatfelter Co.*, 677 F. Supp. 307, 311 (M.D. Pa. 1988)).

15

However, "Pennsylvania's workers' compensation statute provides the sole remedy 'for injuries allegedly sustained during the course of employment.'" *Matczak v. Frankford Candy & Chocolate Co.*, 136 F.3d 933, 940 (3d Cir. 1997) (quoting *Dugan v. Bell Tel. of Pennsylvania*, 876 F. Supp. 713, 723 (W.D. Pa. 1994). This statutory bar applies to IIED claims. *Id.* "There is, however, a narrow personal animus exception where the alleged injury was motivated by personal reasons as opposed to generalized contempt or hatred and did not arise in the course of employment." *Ahmed v. Lowe's Home Ctrs., Inc.*, 346 Fed. App'x 816, 821 (3d Cir. 2009); for the Workers' Compensation law itself, see 77 Pa. Cons. Stat. Ann. § 411(1) ("The term 'injury arising in the course of his employment,' as used in this article, shall not include an injury caused by an act of a third person intended to injure the employe because of reasons personal to him, and not directed against him as an employe or because of his employment . . . .").

At this stage, the Court concludes that Plaintiff has pled sufficient facts to invoke the personal animus exception against Maliyakkal John. The allegations indicate that John acted out of a highly personal motivation (sexual interest in Vnuk specifically) and not out of generalized contempt or hatred. Nor does it indicate that John's sexual interests had anything to do with Vnuk's employment; the fact that the parties apparently met through their common employment is a tangential issue that cannot at this stage be said to be a motivating factor in the alleged sexual harassment.

16

However, the moving party on the instant Motion is not John, but his co-defendant, Berwick Hospital. As discussed above, the only allegations against the Hospital are that it knew about the harassment but failed to stop it, (Am. Compl. at ¶¶ 13-14), that it did not conduct a "'full and effective investigation' of Ms. Vnuk's sexual harassment complaint," (see id. at ¶¶ 19-20), that it suspended Vnuk for unspecified reasons following her complaint but revoked the suspension five hours later, (id. at ¶ 27), that it reduced her hours so that she would not be working at the same time as John, (id. at ¶ 28), and that it did nothing to punish John, "the perpetrator," (id. at ¶ 29). Even when the Court accepts these claims as true, they are insufficient to invoke the personal animus exception to the workers' compensation statute against Berwick Hospital, insofar as they do not evince an intent to harm Vnuk for interests "personal" to the Hospital, an LLC and not an entity with "personal" desires. Moreover, even if the Court assumed, counterfactually, that the IIED claim was not barred against Berwick under the facts alleged, the alleged actions are not such as would arouse the average community member to exclaim "Outrageous!" They may be improper or legally actionable in other ways, but they do not meet the high threshold to state an IIED claim.

The only way in which the IIED claim could lie against the Hospital is if the Hospital could be considered vicariously liable for its employee John's conduct. An employer may be held vicariously liable for the torts of its employee, whether negligent or intentional, if these acts were committed during the course of and within the scope of the tortfeasor's

17

employment. *See Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998).

> In certain circumstances, liability of the employer may also extend to intentional or criminal acts committed by the employee. The conduct of an employee is considered "within the scope of employment" for purposes of vicarious liability if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs substantially within the authorized time and space limits; (3) it is actuated, at least in part, by a purpose to serve the employer; and (4) if force is intentionally used by the employee against another, the use of force is not unexpected by the employer.

*Id.* (internal citations omitted).

Under this test, the Court still finds that Plaintiff fails to state a claim for IIED, as the Complaint does not indicate that sexual harassment was within the scope of John's employment as a medical doctor. Sexually harassing co-workers is not work "of a kind and nature that [a doctor] is employed to perform." This is established at the very least by Plaintiff's allegation that "[t]he Hospital's official sexual harassment policy prohibits all of the behavior identified above." (*See* Am. Compl. at ¶ 18.) Nor is engaging in illegal and internally prohibited sexual harassment "actuated, at least in part, by a purpose to serve the employer." Plaintiff has put forth no allegations that John's sexual harassment served the Hospital's interests, or even that John *believed* that it *could* serve the Hospital's interests. *Cf. also Costa*, 708 A.2d at 493 ("[O]ur courts have held that an assault committed by an employee upon another for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment.") (collecting cases). Because these essential elements of a vicarious liability

18

claim are not met, and because all other grounds for the IIED claim against Berwick Hospital fail, the Court will grant the Hospital's Motion and dismiss Count Eight against Berwick Hospital only.

Ordinarily, the Court would allow Plaintiff leave to immediately amend her Complaint to allege sufficient outrageous conduct by Berwick Hospital. However, the Court notes Plaintiff's statement that "[t]he Hospital engaged in more recent and extremely severe retaliation" not alleged in the Amended Complaint, and that Plaintiff plans to file a new complaint regarding this conduct when she receives a Notice of Right to Sue from the PHRC and EEOC. (See Am. Compl. at p. 7 n. 1.) Given these circumstances, it would be inexpedient to allow Plaintiff to amend her Complaint to correct the deficiencies cited in this Opinion only to then allow her to amend it a third time upon receipt of a Notice of Right to Sue. In order to promote the most efficient disposition of this case, the Court will dismiss Count Eight against Berwick Hospital without leave to amend at the present time, but will allow amendment upon motion by the Plaintiff after she receives her Notice.

IV. <u>Conclusion</u>

For the foregoing reasons, Defendant Maliyakkal John's Motion to Dismiss (Doc. 8) is **DENIED** and Defendant Berwick Hospital's Motion to Dismiss (Doc. 11) is **GRANTED**. A separate Order follows.

*/s/ Robert D. Mariani*
Robert D. Mariani
United States District Judge